BOGNC, LLC v. Cornelius NC Self-Storage LLC, 2013 NCBC 26.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | CONSOLIDATED CASES |

BOGNC, LLC,
                              Plaintiff,

v.

CORNELIUS NC SELF-STORAGE LLC,
DOUGLAS M. PRUITT and
wife, KRISTA A. PRUITT and
ROBERT E. WATSON and wife,
LOIS J. WATSON,
        Defendants and Third-Party Plaintiffs,

v.

HARRY STATHOPOULOS, F. EUGENE
ALLISON, CSSNC, LLC, WILLIAM R.
WALTON, DEBORAH A. WHITE, and
TRAY RORIE,
                Third-Party Defendants,

10 CVS 19072

**ORDER AND OPINION**

ROBERT E. WATSON and
DOUGLAS M. PRUITT,
Individually, and derivatively on behalf of
Cornelius NC Self-Storage, LLC, LOIS J.
WATSON, and KRISTA A. PRUITT,
                              Plaintiffs,

v.

WILLIAM R. WALTON, DEBORAH A.
WHITE, TRAY RORIE and CORNELIUS
NC SELF-STORAGE, LLC,
                              Defendants,

v.

PRUITT CONSTRUCTION, INC.
                Third-Party Defendant.

10 CVS 12371

CORNELIUS NC SELF-STORAGE, LLC,
                              Plaintiff,

11 CVS 21122

v.

TOWING INSURANCE SPECIALISTS, LLC, and OLD STATESVILLE ROAD STORAGE, LLC,

Defendants.

*The Chagaris Law Firm PA by Chris Chagaris for BOGNC, LLC.*

*McMickle, Kurey & Branch, LLP, by Kevin P. Branch and Michael P. Johnson for Robert E. Watson, Lois J. Watson, Douglas M. Pruitt, and Krista A. Pruitt.*

*Robinson Elliott and Smith by William C. Robinson and Katherine A. Tenfelde for William R. Walton, Deborah A. White, and Tray Rorie.*

Murphy, Judge.

{1} **THIS MATTER** is before the Court on Robert E. Watson ("Watson") and Douglas M. Pruitt's ("Pruitt") (collectively, "Plaintiffs") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Motion I") and William R. Walton ("Walton"), Deborah A. White ("White"), and Tray Rorie's ("Rorie") (collectively, "Defendants") Motion for Summary Judgment pursuant to Rule 56 ("Motion II"). Having considered the parties' motions, briefs, affidavits, depositions, and arguments made by counsel at the February 27, 2013, hearing, the Court hereby **GRANTS** in part and **DENIES** in part Motions I and II.

I.

PROCEDURAL HISTORY

{2} On August 9, 2010, Plaintiffs filed a Complaint in 10 CVS 12371 (the "First Action") asserting claims individually with their wives, Krista A. Pruitt and Lois J. Watson, and derivatively on behalf of Cornelius NC Self-Storage, LLC ("Cornelius") for breach of contract, constructive fraud, constructive trust, and breach of fiduciary duty, including breach of the duties of good faith, fair dealing, and loyalty, against Walton and Rorie; negligent misrepresentation and unfair and deceptive trade practices against Walton; unjust enrichment, civil conspiracy, and

punitive damages against Walton, Rorie, and White; and accounting and dissolution of Cornelius.

{3}     That same day, Plaintiffs filed notice of designation to the North Carolina Business Court, and the First Action was designated a mandatory complex business case.

{4}     On September 20, 2010, BOGNC, LLC ("BOGNC") filed a Complaint in 10 CVS 19072 (the "Second Action") seeking to collect on a debt owed by Cornelius and personally guaranteed by Pruitt, Watson, Krista A. Pruitt, and Lois J. Watson.

{5}     On October 29, 2010, Plaintiffs and their wives filed notice of designation to the North Carolina Business Court in the Second Action. Subsequently, the Second Action was designated a mandatory complex business case on November 1, 2010.

{6}     After being assigned to this Court, on December 6, 2010, Plaintiffs and their wives filed their Motion to Dismiss, Answer, Affirmative Defenses, Counterclaims, Cross-claim and Third-Party Complaint ("Third-Party Complaint") in the Second Action.  Relying largely on the same facts alleged in the First Action, Plaintiffs' Third-Party Complaint brought similar claims individually against Walton, White, and Rorie for contribution/indemnification and civil conspiracy, and against Walton and Rorie for fraud, negligent misrepresentation, breach of fiduciary duty, constructive fraud, breach of the covenants of good faith, loyalty, and due care, unfair and deceptive trade practices, and punitive damages.

{7}     Given the overlapping nature of the facts in both cases, the Court consolidated the two actions for discovery purposes on January 10, 2012. *BOGNC, LLC v. Cornelius NC Self-Storage LLC*, No. 10 CVS 19072 (N.C. Super. Ct. Jan. 10, 2012) (order consolidating the First and Second Actions).

{8}     On June 1, 2012, the Court appointed a receiver for Cornelius ("Receiver") to manage the company, take charge of any litigation or claims asserted by the company, and effectuate the orderly liquidation of assets. [1]  *BOGNC, LLC v.*

---

[1] After appointment, the Receiver became aware of a third pending case brought by Cornelius against two entities in which Watson was a member/manager.  Cornelius filed the Complaint in 11

*Cornelius NC Self-Storage LLC*, No. 10 CVS 19072 (N.C. Super. Ct. June 1, 2012) (order appointing receiver). At a hearing held on December 14, 2012, the Receiver stated she would surrender all of Cornelius' derivative claims back to the members.

{9} On November 16, 2012, Plaintiffs filed Motion I in the First and Second Actions seeking partial summary judgment against Walton and Rorie for breach of fiduciary duty, breach of the duties of good faith, due care, and loyalty, and breach of Walton's Non-Competition Agreement. The matter was fully briefed on January 3, 2013.

{10} Also on November 16, 2012, Defendants filed Motion II in the First and Second Actions for summary judgment on all claims brought against them. Motion II was fully briefed on January 17, 2013.

{11} The Court held a hearing on Motions I and II on February 27, 2013.

II.

FACTUAL BACKGROUND

{12} On a motion for summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure, the Court does not make findings of fact to resolve an issue of material fact. "[S]ummary judgment presupposes that there are no triable issues of material fact." *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975). Therefore, the Court recites only those material facts that the Court concludes are not disputed, and which justify entering judgment. *Id.*

{13} On August 8, 2007, Watson, Pruitt, Walton, and Rorie formed Cornelius, a limited liability company, to construct and operate a self-storage facility (the "Property") in Cornelius, North Carolina. (Walton Dep. 29:1–33:19, July 30, 2012.) The following day, the four members signed the Operating

---

CVS 21122 (the "Third Action") on November 16, 2011. Because the Third Action involves similar parties and facts, the Receiver moved to consolidate the Third Action with the First and Second Actions on January 4, 2013. On February 11, 2013, with no objection from the other parties, the Court granted the Receiver's motion, and consolidated the Third Action. However, none of the parties involved moved for summary judgment in the Third Action, and, thus, it is not relevant to the Court's determination of Motions I and II.

Agreement of Cornelius NC Self-Storage, LLC ("Operating Agreement"). (Defs.' Br. Supp. Mot. II Ex. A.)

{14} In the Operating Agreement, Watson, Pruitt, and Walton each took a 16.666% interest in Cornelius, while Rorie received a 50% interest in exchange for his investment of $1,000,000. (Defs.' Br. Supp. Mot. II Ex. A, Ex. A; Walton Dep. 34:6–9, July 30, 2012.) Under Section 6.1, the Operating Agreement provided that "no Member shall be personally obligated . . . for any debts, obligations or liabilities of [Cornelius] solely by reason of such [p]erson being a Member of [Cornelius]." (Defs.' Br. Supp. Mot. II Ex. A § 6.1.) The Operating Agreement also included the following language: "[t]here shall be one (1) Manager who initially shall be Storage Development & Capital, LLC." (Defs.' Br. Supp. Mot. II Ex. A § 5.1.) Storage Development & Capital, LLC ("SD&C") is a limited liability company managed by Watson. (Watson Aff. ¶ 1, Jan. 4, 2013.)

{15} Regarding the manager's duties, the Operating Agreement reads in relevant part as follows:

> The Manager shall manage or cause to be managed the affairs of [Cornelius] in a prudent and businesslike manner . . . . In carrying out his or her obligations, the Manager shall: . . . (C) Maintain complete and accurate records of all properties owned or leased by [Cornelius] and complete and accurate books of account . . ., and make such records and books of account available for inspection and audit by any Member . . . .

(Defs.' Br. Supp. Mot. II Ex. A § 5.5.) However, the Operating Agreement limits the manager's liability to "willful or fraudulent misconduct in the performance of his [] obligations under this Agreement, or for gross negligence or willful breach of [his] fiduciary duties under this Agreement." (Defs.' Br. Supp. Mot. II Ex. A § 5.5.) The Operating Agreement also entitles the manager to indemnification by Cornelius for liability arising out of good faith actions taken within his authority. (Defs.' Br. Supp. Mot. II Ex. A § 5.5.)

{16} Further, "[t]he Manager shall hold office . . . until his or her successor is elected, or until . . . removal from office . . . ." (Defs.' Br. Supp. Mot. II Ex. A § 5.3.) The Operating Agreement provides for the manager to "be elected at each

annual meeting of Members or at a special meeting called for the purpose of electing the Manager, or . . . at any time by unanimous written action of the Members." (Defs.' Br. Supp. Mot. II Ex. A § 5.2.)

{17}   Under the Operating Agreement, actions that must or may "be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the Members holding a majority of the outstanding Voting Units held by Members . . . ." (Defs.' Br. Supp. Mot. II Ex. A § 7.11.)  Any amendments to the Operating Agreement could also be made if "in writing and signed by Persons constituting the affirmative Majority Vote of Units . . . ." (Defs.' Br. Supp. Mot. II Ex. A § 16.15.)

{18}   On August 24, 2007, Cornelius borrowed $3,876,000 from the Bank of Granite to finance the first phase of construction on the Property, and signed a Promissory Note (the "Note") and Deed of Trust in favor of the Bank of Granite. (Watson Aff. ¶ 2, Ex. 1, Jan. 4, 2013.)  As additional security on the loan, Watson, Pruitt, Walton, White, Krista A. Pruitt, and Lois J. Watson all signed personal guaranties on the Note (the "Guaranties").  (Watson Aff. ¶ 2, Jan. 4, 2013.)  The Guaranties held the guarantors jointly and severally liable for all present and future debts of Cornelius, including "the payment and performance of each and every debt, liability and obligation of every type and description which [Cornelius] may now or at any time hereafter owe to [Bank of Granite]."  (Second Action Compl. Ex. A, B.)

{19}   In March 2009, Cornelius entered into an amended loan agreement with the Bank of Granite for the principal sum of $4,322,262 to fund the second phase of construction.  (Second Action Compl. Ex. C; Watson Aff. ¶¶ 2, 4, Jan. 4, 2013.)

{20}   Following a site visit in September 2009, however, Bank of Granite informed Cornelius that Bank of Granite would no longer cover the monthly interest payments on the construction loan, and that the members of Cornelius would have to pay the overages on the project before the Bank of Granite would

release the remainder of the loan funds. (Watson Aff. ¶ 3, Jan. 4, 2013; Walton Dep. 117:8–24, 121:3–13, July 30, 2012.)

{21} The Bank of Granite's decision placed Cornelius in a perilous financial position. In response, Watson began to solicit new investors to either buy the Note or invest in Cornelius. (Walton Dep. 135:14–21, July 30, 2012; Watson Aff. ¶ 4, Jan. 4, 2013.)

{22} In October 2009, Watson recruited Warren Allan with Optivest Properties, LLC ("Optivest") to contribute equity to Cornelius or buy the Note from the Bank of Granite in exchange for an interest in Cornelius. (Watson Aff. ¶ 5, Jan. 4, 2013.) Watson asserts that Walton continually represented to him that he was willing to relinquish his interest in Cornelius if he could be released from his Guaranty, and that Optivest agreed to accept Walton's interest in Cornelius. (Watson Aff. ¶ 6, Jan. 4, 2013; Walton Dep. 151:9–14, July 30, 2012.) However, Walton argues that he requested more information about the deal before he would approve it. (Walton Dep. 151:9–25, July 30, 2012)

{23} Subsequently, Walton began structuring his own deal with a group of investors, including Harry Stathopoulos ("Stathopoulos") and Eugene Allison ("Allison"), to purchase the Note and foreclose on the Property. (Walton Dep. 228–232, July 30, 2012.) Walton's investor group never fully incorporated, but it used the name Newco. (Walton Dep. Ex. 47, July 30, 2012.) Thereafter, the members of Newco began negotiating with the Bank of Granite to purchase the Note. (Walton Dep. 230:24–232:5, July 30, 2012.) At no point did Walton inform Plaintiffs about Newco or his plans to purchase the Note. (Walton Dep. 235:17–25, 309:18–310:2, July 30, 2012.)

{24} As late as March 12, 2010, Walton assured Watson that he was interested in Watson's deal to purchase the Note. (Walton Dep. 235:10–16, July 30, 2012.) Although by that time, Walton was actively working on a separate deal with his group, Newco, to purchase the Note. (Walton Dep. 235:17–25, July 30, 2012.) When Watson asked Walton about the competing deal, Walton admittedly dodged

the question "to keep Watson out of [his] hair." (Walton Dep. 410:9–16, July 31, 2012.)

{25} On April 13, 2010, Walton and Rorie, as members of Cornelius, executed a Written Consent to Action Without a Meeting, removed SD&C as manager of Cornelius, and voted themselves in as the new co-managers. (Defs.' Br. Supp. Mot. II Ex. B.) After assuming their roles as co-managers, Walton and Rorie entered into the Co-Manager Agreement that noted Newco's purchase of the Note and the plan to transfer ownership of the Property to Newco. (Defs.' Br. Supp. Mot. II Ex. B.) In particular, the Co-Manager Agreement acknowledged Walton and Allison's agreement, as principals in Newco, to invite Rorie to join Newco to help recoup his investment in Cornelius. The Co-Manager Agreement also recognized Walton and Rorie's agreement to serve as managers of Cornelius "to obtain information about the operation of the Company . . . [and] expeditiously consummate selling or transferring the assets to [Newco] . . . ." (Defs.' Br. Supp. Mot. II Ex. B.) To recoup his investment, Rorie would receive a percentage of any recovery on the Guaranties against Plaintiffs and their wives. (Rorie Dep. 114:17–20, Aug. 1, 2012.)

{26} On April 9, 2010, Newco purchased the Note from Bank of Granite. (Defs.' Br. Opp. Mot. I Ex. F at 122.) On April 16, 2010, Stathopoulos formed BOGNC to hold the Note and collect any deficiency after the foreclosure. (Walton Dep. 438:12–22, July 31, 2012.) Thus, on April 19, 2010, Newco conveyed the Note to BOGNC. (Pls.' Br. Opp. Mot. II Ex. 74.)

{27} Along with other members, Allison and Walton formed CSSNC, LLC ("CSSNC") on April 26, 2010, to pursue foreclosure on the Note. (Walton Dep. Ex. 37, July 30, 2012.) To facilitate this arrangement, BOGNC transferred the Note to CSSNC on May 28, 2010. (Walton Dep. Ex. 52, July 31, 2012.) Prior to foreclosure, however, CSSNC entered into a settlement agreement with Walton and White, and released them from their Guaranties.

{28} On June 11, 2010, CSSNC foreclosed on the Note. (Defs.' Br. Opp. Mot. I 14.) After an initial bid from CSSNC, an acquaintance and investor aligned

with Watson submitted an upset bid that was countered by CSSNC with another upset bid.  After this new upset bid, Watson claims that he requested Cornelius' financial records to solicit additional bids on the Property in the hopes of saving Cornelius and avoiding liability on the Guaranties.  (Watson Aff. ¶ 11, Jan. 4, 2013.)

{29}　However, the financial information provided by Walton failed to account for approximately $8,000 of income.  (Watson Aff. ¶ 11, Jan. 4, 2013.)  Watson argues that his acquaintance relied on this information and, because of the discrepancy, refused to outbid CSSNC for the Property.  (First Action V. Am. Compl. ¶¶ 75–76; Watson Aff. ¶ 11, Jan. 4, 2013.)  Walton asserts that this discrepancy was a good faith mistake made during the bookkeeper's vacation, and was corrected shortly after her return.  (Defs.' Reply Supp. Mot. II 10–11.)  Nevertheless, CSSNC became the owner of the Property on July 6, 2010, with a high bid of $3,400,000.  (Defs.' Br. Opp. Mot. I 14–15.)  Neither Watson nor Optivest bid on the Property in foreclosure.

{30}　After CSSNC took ownership of the Property, it assigned the Note with the remaining deficiency back to BOGNC.  (Walton Dep. Ex. 54, July 31, 2012.)  BOGNC then credited the foreclosure price to the outstanding balance on the debt, leaving a deficiency totaling $955,309.97 with interest.  (Walton Dep. Ex. 54 Recitals D, July 31, 2012.)  Based on financial statements from CSSNC, Plaintiffs argue that the Property continued to be profitable after CSSNC took control.  (Watson Aff. ¶¶ 14–24, Ex. A–C, Jan. 4, 2013.)

III.

LEGAL STANDARD

{31}　"The purpose of summary judgment is to determine whether any issues of material fact exist, and if not, eliminate the necessity of a full trial where only questions of law are involved." *Strickland v. Lawrence*, 176 N.C. App. 656, 661, 627 S.E.2d 301, 305 (2006) (citing *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 641–42, 281 S.E.2d 36, 40 (1981)).  Thus, the Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c).

{32} "The movant has the burden of establishing the absence of any triable issues of fact." *Strickland*, 176 N.C. App. at 661, 627 S.E.2d at 305. This burden can be met in one of two ways: "(1) 'by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense'; or (2) 'by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim.'" *Id.* (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)).

{33} In ruling on a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. *See Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 178, 480 S.E.2d 53, 55 (1997) (citation omitted).

IV.

ANALYSIS

{34} In Motion I, Plaintiffs move for summary judgment on breach of fiduciary duty, including the duties of good faith, due care, and loyalty, and breach of Walton's Non-Competition Agreement. Defendants, however, seek summary judgment on all claims asserted against them, including the claims relevant to Motion I. Given this overlap, the Court will consider Motions I and II together. And, because Plaintiffs rely on similar allegations and the same facts produced in discovery in support of their claims, the Court will consider all claims brought against Defendants in the First and Second Actions together.

A.

CIVIL CONSPIRACY

{35} "[T]here is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) (citations omitted). Recovery under a claim of conspiracy must be based on an underlying claim of unlawful conduct. *Id.* Specifically, to recover, the plaintiff must show "(1) an agreement between two or more individuals; (2) to do an unlawful act

or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quotation and citation omitted).

{36} Here, Plaintiffs allege that Walton, Rorie and White entered into a conspiracy to rig the foreclosure on the Note, benefiting themselves financially at the expense of Plaintiffs and Cornelius. In support of this claim, Plaintiffs point to the Co-Manager Agreement wherein Walton and Rorie agreed to take over Cornelius and expeditiously transfer Cornelius' assets to Newco. (Defs.' Br. Supp. Mot. II Ex. B.) To effectuate the terms of the Co-Manager Agreement, Plaintiffs argue that Rorie, as a co-manager with access to Cornelius' accounts, agreed to engage in a common scheme to defraud Plaintiffs and rig the foreclosure by concealing Cornelius' financial information. This scheme allegedly resulted in a lower price being paid for the Note in foreclosure causing a higher deficiency brought against Plaintiffs and Cornelius. Although the evidence is far from determinative, the Court concludes that factual disputes still exist regarding Rorie's knowledge of the scheme and the actions attributed to Walton in the underlying claims discussed more fully below.

{37} However, Plaintiffs put forward no specific evidence of White's involvement in any fraudulent scheme or unlawful conduct beyond signing the initial Guaranty on the Note, nor do Plaintiffs argue as such in the response to Motion II. (*See* Pls.' Resp. Br. Opp. Mot. II 30.) Therefore, the Court concludes that no genuine issue remains for trial regarding White's involvement in the civil conspiracy.

{38} Accordingly, the Court hereby **GRANTS** Motion II as to White and, for reasons discussed below, **DENIES** Motion II as to Walton and Rorie. Plaintiffs' claim for civil conspiracy as to White is **DISMISSED** with prejudice.

B.

## BREACH OF FIDUCIARY DUTY

{39}    "'For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties.'" *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 472, 675 S.E.2d 133, 136 (2009) (quoting *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)).  Our Supreme Court defined a fiduciary relationship as:

> one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

*Dalton*, 353 N.C. at 651, 548 S.E.2d at 707–08 (quotation omitted).

{40}    Plaintiffs assert this claim both individually and derivatively on behalf of Cornelius.  The parties do not dispute that Walton and Rorie owed fiduciary duties to Cornelius after assuming their roles as managers on April 13, 2010.  (Pls.' Br. Supp. Mot. I 5; Defs.' Br. Supp. Mot. II 9); *see also* N.C. GEN. STAT. § 57C-3-22(b) (2013).  However, Plaintiffs argue that Walton and Rorie also owed fiduciary duties to Plaintiffs individually based on (1) Walton and Rorie's role as managers, (2) Walton and Rorie's majority interest in Cornelius, (3) Walton's position as co-guarantor on the Note, and (4) Walton and Rorie's obligations to creditors of a defunct company.  The Court will first address Plaintiffs' individual bases for breach of fiduciary duty before turning to the derivative claim.

1.

## WALTON AND RORIE AS MANAGERS

{41}    Pursuant to the North Carolina Limited Liability Act ("LLC Act"), a manager of a limited liability company "shall discharge his duties as manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner the manager reasonably believes to be in the best interests of the limited liability company."  N.C. GEN. STAT. § 57C-3-22(b) (2013).  The manager owes these fiduciary duties to the company, however, not to the individual members.  *Kaplan*, 196 N.C. App. at 474,

675 S.E.2d at 137. In that respect, the court in *Kaplan* compared managers of limited liability companies to directors of corporations in that "where it is alleged that directors have breached [their] duty [as directors], the action is properly maintained *by the corporation* rather than any individual creditor or stockholder." *Id.* (quoting *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 248, 567 S.E.2d 781, 786–87 (2002) (citations omitted)) (emphasis original).

{42}   Thus, Walton and Rorie owed no fiduciary duty to the members of Cornelius. Plaintiffs also failed to put forth any evidence or arguments to suggest that the distinct factual circumstances of this case gave rise to a special confidence reposed in Walton and Rorie as managers. Indeed, by the time Walton and Rorie seized control, the atmosphere of distrust among the members of Cornelius was pervasive. Therefore, the Court concludes that Walton and Rorie do not owe a fiduciary duty to Plaintiffs based on their role as managers of Cornelius.[2]

2.

WALTON AND RORIE'S MAJORITY INTEREST IN CORNELIUS

{43}   Under the LLC Act, "[m]embers of a limited liability company are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company." *Kaplan*, 196 N.C. App. at 473, 675 S.E.2d at 137 (citation omitted). "An exception to this rule is that a controlling shareholder owes a fiduciary duty to minority shareholders." *Id.* In *Kaplan*, the court determined that, although plaintiff's 41.5% ownership interest made him the largest percentage owner, it did not make him a majority member, and, thus, he did not owe fiduciary duties to the other members of the limited liability company. *Id.*

{44}   Here, Walton and Rorie own 16.666% and 50% of Cornelius, respectively. (Defs.' Br. Supp. Mot. II Ex. A.) Neither owns a majority interest in Cornelius, and neither could individually control Cornelius. Plaintiffs cannot claim

---

[2] Plaintiffs point out that, in his deposition, Walton answered in the affirmative when asked if he owed "fiduciary obligations as the manager to the minority members of Cornelius." (Walton Dep. 318:17–20, July 31, 2012.) However, this is a legal conclusion based on the relationship between the parties, and is an incorrect one as discussed above. The Court concludes, therefore, that this statement alone, without any evidence supporting the existence of a fiduciary duty, fails to create a genuine issue of fact.

a fiduciary duty was owed to them as minority members simply because Walton and Rorie out voted them.  Given their status, the Court concludes that Walton and Rorie did not owe a fiduciary duty to the other minority members of Cornelius.

3.

WALTON AS CO-GUARANTOR ON THE NOTE

{45}    Plaintiffs argue that the relationship among the co-guarantors created by virtue of the Guaranties on the Note presents "the type of special relationship of trust and confidence that imposes upon them the obligation to avoid material omissions." (Pls.' Resp. Mot. II 20.)  However, the only two cases Plaintiffs cite in support of this contention in the Summary Judgment briefs are unpersuasive.  *See Setzer v. Old Republic Life Ins. Co.*, 257 N.C. 396, 126 S.E.2d 135 (1962) (concluding that the relationship between an insurance agent and the insured did not give rise to a relationship of trust and confidence); *Breeden v. Richmond Community College*, 171 F.R.D. 189 (M.D.N.C. 1997) (holding that the plaintiff did not establish a duty to speak against his former employer).   Indeed, the Court can find no legal support for the contention that co-guarantors on a note stand in a special relationship with one another such that "the law imposes an obligation on the part of one to safeguard the interest of the other with the same fidelity he safeguards his own." *Setzer*, 257 N.C. at 399, 126 S.E.2d at 137 (quotation omitted).  While a fiduciary relationship may arise in specific factual situations, the relationship is still limited to one of dominance and control.  *See Dalton*, 353 N.C. at 651–52, 548 S.E.2d at 707–08.

{46}    Here, it does not appear from the record that any special confidence was reposed in Walton as a result of the Guaranties, or that the Guaranties resulted in domination or control by Walton over his fellow guarantors.  Even though Watson, Pruitt, Walton, White, Krista A. Pruitt, and Lois J. Watson signed the Guaranties on August 24, 2007 (Watson Aff. ¶ 2, Ex. 1, Jan. 4, 2013), Watson continued to control the business until April 13, 2010.  (Defs.' Br. Supp. Mot. II Ex. B.)  Therefore, the Court concludes that Walton does not owe a fiduciary duty to Plaintiffs as a co-guarantor on the Note.

4.

WALTON AND RORIE'S DUTY TO CREDITORS OF CORNELIUS

{47}    Finally, Plaintiffs rely on corporate law to support their argument that, as managers of a defunct company, Walton and Rorie owe fiduciary duties to Cornelius' creditors. And, as guarantors on the Note, Plaintiffs assert that they qualify as creditors under N.C. Gen. Stat. § 26-3.1.

{48}    Pursuant to section 26-3.1, "[a] surety *who has paid his principal's note, bill, bond, or other written obligation*, . . . may maintain any action or avail himself of any remedy which the creditor himself might have had against the principal debtor." N.C. GEN. STAT. § 26-3.1(a) (2013) (emphasis added). "The word 'surety' . . . includes a guarantor . . . ." § 26-3.1(b). Thus, only a guarantor who has satisfied the principal debt may be substituted to the rights of the creditor. § 26-3.1(a); *see also Harshaw v. Mustafa*, 321 N.C. 288, 362 S.E.2d 541 (1987).

{49}    As the deficiency still exists, it appears undisputed that Plaintiffs have not paid the obligation due on the Note. As a result, Plaintiffs may not assume the rights of a creditor of Cornelius, and, thus, the Court concludes that Walton and Rorie do not owe Plaintiffs a fiduciary duty as creditors of Cornelius.[3]

{50}    Given the above, the Court concludes that no issues of fact remain regarding the existence of a fiduciary duty owed by Walton and Rorie to Plaintiffs individually. Plaintiffs failed to prove an essential element of their individual claim. The Court, therefore, **GRANTS** Motions I and II in favor of Defendants and **DISMISSES** with prejudice Plaintiffs' individual claim for breach of fiduciary duty, breach of the duties of good faith and fair dealing, and breach of the duty of loyalty and due care.[4]

---

[3] Because the Court concludes that Plaintiffs cannot avail themselves of the remedies available to creditors of Cornelius, the Court need not address whether the law of corporations may be similarly applied to limited liability companies to create a fiduciary duty between managers and creditors of insolvent companies.

[4] Based on the allegations, the Court concludes that these claims all seek relief under a general breach of fiduciary duty cause of action. In the allegations and throughout their briefs, Plaintiffs group these claims together, and argue in support of these claims under the umbrella of a general breach of fiduciary duty. Therefore, the Court analyzes these claims together.

BREACH OF FIDUCIARY DUTY OWED TO CORNELIUS

{51}  The parties do not dispute that Walton and Rorie owed Cornelius a fiduciary duty after assuming their roles as managers of the company. However, the Court must determine whether any questions of fact remain on the element of breach.

{52}  The LLC Act imposes certain default duties upon the manager of a limited liability company to "discharge his duties as manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner the manager reasonably believes to be in the best interests of the limited liability company." N.C. GEN. STAT. § 57C-3-22(b) (2013). The LLC Act also allows the members to limit the liability of their managers for breach of these duties. N.C. GEN. STAT. § 57C-3-32(a) (2013). However, no such provision may limit a manager's liability for acts known to be in conflict with the interests of the limited liability company, or for acts from which the manager derived an improper personal benefit. § 57C-3-32(b).

{53}  Here, Plaintiffs argue that Walton and Rorie's deal to purchase the Note for as little as possible in foreclosure put them in conflict with their duty to Cornelius to maximize the amount received in foreclosure. The Co-Manager Agreement appears to suggest this arrangement. (Defs.' Br. Supp. Mot. II Ex. B.) Therefore, although the members agreed in the Operating Agreement to limit the managers' liability to "willful or fraudulent misconduct . . . or for gross negligence or willful breach of their fiduciary duties," (Defs.' Br. Supp. Mot. II Ex. A § 5.5), questions remain as to whether Walton and Rorie willfully breached their fiduciary duties by pursuing the purchase of the Note and subsequent foreclosure, or, at least, knew their actions conflicted with the interests of Cornelius. These are factual questions to be decided at trial.

{54}  Accordingly, the Court concludes that a factual dispute remains on Plaintiffs' derivative claim for breach of fiduciary duty. The Court, therefore, **DENIES** Motions I and II as to the derivative claim for breach of fiduciary duty.

## C.
## CONSTRUCTIVE FRAUD

{55}    "A constructive fraud claim requires proof of circumstances: '(1) which created the relation of trust and confidence [the "fiduciary" relationship], and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.'" *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 249, 567 S.E.2d 781, 787–88 (2002) (quoting *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)) (alterations original). "Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty," *id.* at 249–50, 567 S.E.2d at 788, and that the defendant sought to benefit himself at the plaintiff's expense. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997).

{56}    Having previously determined that Walton and Rorie do not owe a fiduciary duty to Plaintiffs individually, Plaintiffs' individual claims for constructive fraud fail as a matter of law. However, as noted above, a material question of fact remains regarding Walton and Rorie's alleged breach of their fiduciary duties owed to Cornelius. Similarly, the Court cannot conclude as a matter of law whether Walton and Rorie's alleged breach benefited them at Cornelius' expense, as Plaintiffs assert.

{57}    Therefore, the Court hereby **GRANTS** Motion II as to Plaintiffs' individual claim for constructive fraud, and **DENIES** Motion II as to Plaintiffs' derivative claim for constructive fraud. Plaintiffs' individual claim for constructive fraud is **DISMISSED** with prejudice.

## D.
## BREACH OF CONTRACT
## 1.
## NON-COMPETITION AGREEMENT (MOTION I)

{58}    Plaintiffs only seek summary judgment under Motion I for Walton's breach of the Non-Competition Agreement. Rule 56 of the North Carolina Rules of

Civil Procedure allows "[a] party seeking to recover upon a claim, [or] counterclaim . . . [to] move . . . for summary judgment in his favor on all or part thereof." N.C. R. Civ. P. 56. Therefore, a party must first seek recovery on the claim before he may be entitled to summary judgment on that claim.

{59}   In the First Action, Plaintiffs alleged breach of contract against Walton and Rorie for the following: (1) "conducting an unsanctioned, and unnoticed members' meeting, in which they purported to oust SD&C as manager, and elect themselves as co-managers"; (2) "failing to manage [Cornelius'] affairs in a prudent and businesslike matter"; and (3) "acting in their own self-interest as co-managers, rather than in the interests of the Company and its members." (First Action Compl. ¶¶ 52–54.) None of the allegations in the Complaint reference a Non-Competition Agreement or speak to how Walton's actions breached any such provision in the Operating Agreement. Indeed, the allegations of breach of contract all speak to Walton and Rorie's actions as managers of Cornelius and on behalf of Cornelius rather than their individual actions as members in competition with Cornelius. There is also no mention of the Non-Competition Agreement elsewhere in the pleadings. Plaintiffs only point to one other mention of the Non-Competition Agreement in any filing with the Court, and that was in a brief filed in the Second Action and not related to the breach of contract claim brought in the First Action. (Br. Supp. Mot. to File Supp. Resp. to BOGNC's Mot. Summ. J. 7.) Therefore, the Court concludes that Plaintiffs' claim for Walton's breach of the Non-Competition Agreement is not properly before the Court.

{60}   Accordingly, the Court hereby **DENIES** Motion I as to Walton's breach of the Non-Competition Agreement.

2.

OTHER CONTRACT PROVISIONS (MOTION II)

{61}   "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, the parties do not dispute the existence of a valid contract among Plaintiffs, Defendants, and Cornelius as

memorialized in the Operating Agreement.  However, they dispute the remaining element of breach, under which Plaintiffs argue three breaches occurred.

{62}    First, Plaintiffs accuse Walton and Rorie of "conducting an unsanctioned, and unnoticed members' meeting, in which they purported to oust SD&C as manager, and elect themselves as co-managers." (First Action Compl. ¶ 52.)  The Operating Agreement expressly authorized that "[t]here shall be one (1) Manager who initially shall be Storage Development & Capital, LLC." (Defs.' Br. Supp. Mot. II Ex. A § 5.1.)  Furthermore, "[t]he Manager shall hold office . . . until his or her successor is elected, or until . . . removal from office . . . ." (Defs.' Br. Supp. Mot. II Ex. A § 5.3.)  While the Operating Agreement clearly contemplates the removal of the manager from office, it does not specifically provide the mechanism for such removal.

{63}    In the absence of a provision in the Operating Agreement, the LLC Act controls.  Pursuant to the LLC Act, when the Operating Agreement expressly designates the manager, an amendment to the Operating Agreement may remove the manager's designation and change the number of managers.  N.C. GEN. STAT. § 57C-3-21(3) (2013).

{64}    The Operating Agreement in this case allows the members to amend the Operating Agreement if the amendment is made "in writing and signed by Persons constituting the affirmative Majority Vote of Units . . . ." (Defs.' Br. Supp. Mot. II Ex. A § 16.15.)  The members may also elect a new manager at a special meeting of the members.  (Defs.' Br. Supp. Mot. II Ex. A § 5.2.)  However, any actions that may "be taken at a meeting of Members may [also] be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the Members holding a majority of the outstanding Voting Units . . . ." (Defs.' Br. Supp. Mot. II Ex. A § 7.11.)

{65}    Here, it is undisputed that, with a combined majority of the voting units, Walton and Rorie executed a written consent amending the Operating Agreement to allow for two managers and to remove SD&C's designation as manager, while simultaneously electing themselves as the new managers.  (Defs.'

Br. Supp. Mot. II Ex. B.) Given the above provisions and statutes, the Court concludes that Walton and Rorie acted within their rights under the Operating Agreement.

{66} Second, Plaintiffs allege that Walton and Rorie breached their contractual obligations to manage Cornelius' affairs in a prudent and businesslike manner. (First Action Compl. ¶ 53.) In particular, Plaintiffs point to Section 5.5 of the Operating Agreement that reads in relevant part as follows:

> The Manager shall manage or cause to be managed the affairs of [Cornelius] in a prudent and businesslike manner . . . . In carrying out his or her obligations, the Manager shall: . . . (C) Maintain complete and accurate records of all properties owned or leased by [Cornelius] and complete and accurate books of account . . ., and make such records and books of account available for inspection and audit by any Member . . . .

(Defs.' Br. Supp. Mot. II Ex. A § 5.5.)

{67} However, as noted above, the Operating Agreement limits the manager's liability for breaches of his obligations under the Operating Agreement to willful or fraudulent misconduct, not good faith actions. (Defs.' Br. Supp. Mot. II Ex. A § 5.5.) Here, Plaintiffs allege, and Defendants acknowledge, that a discrepancy occurred in the income reported in June 2010. (Watson Aff. ¶ 11, Jan. 4, 2013; Defs.' Reply Br. Supp. Mot. II.) This would appear to violate Walton and Rorie's obligation to maintain accurate records. Walton and Rorie argue, however, that the discrepancy resulted from a good faith mistake attributable to the bookkeeper's vacation during the time period in question. (Defs.' Reply Supp. Mot. II 10–11.) However, Walton and Rorie's intent with regard to the income reporting presents a disputed factual question. Therefore, whether Walton and Rorie willfully breached their obligation to manage the affairs of Cornelius in a prudent and businesslike manner presents an issue of material fact and not one of law.

{68} Finally, Plaintiffs contend that Walton and Rorie acted in their own self-interest as co-managers, rather than in the interests of the Company and its members, in violation of the terms of the Operating Agreement. (First Action Compl. ¶ 54.) To support this argument, Plaintiffs rely on the limitation of liability

provision from Section 5.5 of the Operating Agreement that holds the managers liable, not for good faith errors, but only for "gross negligence or willful breach of their fiduciary duties under this Agreement." (Defs.' Br. Supp. Mot. II Ex. A § 5.5.) This provision, however, does not create any additional obligations or duties beyond those recognized at law and discussed above under the breach of fiduciary duty claim. It merely limits the managers' liability for breaches of the Operating Agreement and breaches of their fiduciary duties existing under the Operating Agreement. Plaintiffs do not direct the Court to any other provision in the Operating Agreement that would support this allegation for breach. As such, the Court concludes that this basis for Plaintiffs' breach of contract claim fails as a matter of law.

{69} Accordingly, the Court hereby **DENIES** Motion II solely based on Plaintiffs' direct and derivative breach of contract claim as it relates to the allegation that Walton and Rorie failed to manage Cornelius' affairs in a prudent and businesslike manner. Thus, this claim survives only under this theory.

E.

DEMAND FOR ACCOUNTING, INFORMATION, DISSOLUTION OF THE COMPANY, AND DEMAND FOR PRO RATA RECOVERY

{70} On June 1, 2012, the Court granted Plaintiffs' Motion for Appointment of Receiver, and directed the Receiver to "effectuate the orderly liquidation and disposition of the assets" and to retain all books and records of Cornelius. As such, to the extent Plaintiffs seek the appointment of a receiver to manage the affairs of Cornelius and liquidate its assets, this claim is largely moot. However, because the Receiver's work is ongoing and Cornelius has not yet been dissolved, Plaintiffs' request for relief should not be dismissed at this stage. Therefore, the Court **DENIES** Motion II as to Plaintiffs' claim for accounting, information, dissolution, and pro rata recovery.

## F.

## NEGLIGENT MISREPRESENTATION

{71}    "To establish a claim for negligent misrepresentation, a party must show that he: '[(1)] justifiably relies [(2)] to his detriment [(3)] on information prepared without reasonable care [(4)] by one who owed the relying party a duty of care.'" *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 700, 671 S.E.2d 7, 12 (2009) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988)).

{72}    As the Court previously noted, Walton and Rorie did not owe a duty of care to Plaintiffs individually.  Therefore, Plaintiffs' individual claims of negligent misrepresentation against Walton and Rorie fail as a matter of law.  However, in the First Action, Plaintiffs also raise this claim derivatively on behalf of Cornelius against Walton.

{73}    Specifically, Plaintiffs aver that Walton negligently misrepresented Cornelius' June 2010 rent roll upon which *Watson's acquaintance* relied in making a bid in the foreclosure sale.  (First Action V. Am. Compl. ¶¶ 75–76; Watson Aff. ¶ 11, Jan. 4, 2013.)  Plaintiffs' claim appears to be based on the acquaintance's reliance rather than reliance by Cornelius.  To succeed under this claim derivatively, Plaintiffs must show that Cornelius relied on the information.  Without such an allegation, this claim fails as a matter of law.

{74}    Accordingly, the Court hereby **GRANTS** Motion II as to Plaintiffs' individual and derivative claims for negligent misrepresentation.  Plaintiffs' individual claim against Rorie and individual and derivative claims against Walton for negligent misrepresentation are **DISMISSED** with prejudice.

## G.

## FRAUD

{75}    "To survive a motion for summary judgment on the charge of fraud, the record must show evidence of the following: '(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured

party.'" *Hospira*, 194 N.C. App. at 699, 671 S.E.2d at 11 (quoting *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002)).

{76}    "A claim for fraud may be based on an 'affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose.'" *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009) (quoting *Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986)).

> A duty to disclose arises where: (1) a fiduciary relationship exists between the parties to the transaction; (2) there is no fiduciary relationship and a party has taken affirmative steps to conceal material facts from the other; [or] (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

*Id.* (quotations and citations omitted).

{77}    In their Third-Party Complaint, Plaintiffs asserted an individual claim for fraud against Walton, Rorie, and several other defendants not relevant to the current Motions.  Primarily, Plaintiffs argue that Walton and Rorie concealed their efforts to purchase the Note in order to extinguish Walton's liability under the Guaranty, thwart Watson's attempts to cultivate investors, and take over Cornelius. (Third-Party Compl. ¶¶ 78–85.)  To prevail under this theory, Plaintiffs must establish that Walton and Rorie had a duty to disclose their involvement to Plaintiffs.  Although Walton and Rorie did not owe Plaintiffs a fiduciary duty, factual issues remain as to the alleged steps Walton took to conceal his involvement in the purchase of the Note and the release his Guaranty, and whether such affirmative steps gave rise to a duty to disclose his involvement in the deal.

{78}    In particular, Plaintiffs point to Walton's empty assurances of support for Watson's deal (Walton Dep. 235:10–16, July 30, 2012.), Walton's refusal to acknowledge his involvement in the purchase of the Note "to keep Watson out of [his] hair" (Walton Dep. 410:9–16, July 31, 2012.), and the inaccurate income records provided to Plaintiffs and their investors during the foreclosure.  (Watson Aff. ¶ 11, Jan. 4, 2013.)  These actions not only present a question of fact regarding

Walton's duty to disclose, but could also amount to affirmative misrepresentations. Thus, viewing this evidence in a light most favorable to Plaintiffs, the Court concludes that factual disputes remain as to Walton's fraud.

{79}   Although Plaintiffs produced little direct evidence as to Rorie's involvement in these actions, Plaintiffs did produce some evidence that Rorie engaged in a civil conspiracy with Walton to defraud Plaintiffs.  When a civil conspiracy exists, the plaintiff may "associate the defendants together [such that] the acts and conduct of one might be admissible against all." *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005).  Thus, because the facts remain in dispute as to the elements of fraud against Walton, in particular his duty to disclose, his intent and Plaintiffs' reliance, the Court does not rule as a matter of law on the fraud claim.

{80}   Accordingly, the Court hereby **DENIES** Motion II as to Plaintiffs' individual claim for fraud against Walton and Rorie.

H.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{81}   "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

{82}   "Plaintiff must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *Hajmm Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991) (citation omitted).  The internal operations of a single business are not "in or affecting commerce." *See White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010).  However, dealings between individual businesses and between businesses and consumers fall squarely within acts intended to be regulated by the Unfair and Deceptive Trade Practices Act. *Id.*

{83} Here, although the dispute began as an internal disagreement between the members and managers of Cornelius, the parties subsequently involved several other businesses in their dealings, including BOGNC, Newco, and CSSNC. As such, the Court concludes that the actions were "in or affecting commerce."

{84} Generally, proof of some independent tort committed in or affecting commerce will suffice to make out a claim for unfair and deceptive trade practices. *See Sara Lee Corp. v. Carter*, 351 N.C. 27, 31–33, 519 S.E.2d 308, 311–12 (1999) (concluding that the breach of fiduciary duty claim also gave rise to an unfair and deceptive trade practices claim); *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991) ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts . . . ."). Having concluded above that some evidence exists to withstand summary judgment on Plaintiffs' individual claim for fraud and derivative claim for breach of fiduciary duty, the Court similarly concludes that sufficient evidence exists of an unfair and deceptive act.

{85} However, Defendants then argue that Plaintiffs' failed to forecast damages to support this claim. The record, however, presents a question of fact as to the damage suffered by Plaintiffs and Cornelius as a result of Walton and Rorie's actions. Specifically, there remains a genuine issue as to whether Walton and Rorie's actions wrongfully exposed Plaintiffs and Cornelius to greater liability on the Note and Guaranties by allegedly rigging the foreclosure. Furthermore, as to Plaintiffs' derivative claim, Plaintiffs assert that Cornelius suffered lost profits after the foreclosure transferred ownership and operation of the Property to CSSNC.

{86} "In order to recover damages for lost profits, the complainant . . . must ascertain such losses with 'reasonable certainty'. . .[, not] based upon hypothetical or speculative forecasts of losses.'" *Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 847, 431 S.E.2d 767, 770 (1993) (quoting *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 356 S.E.2d 578 (1987)). To accomplish this, the plaintiff may rely on "expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises." *Iron Steamer, Ltd.*, 110 N.C. App. at 849, 431 S.E.2d at 771 (quotation and citation omitted).

{87}     Here, Plaintiffs point to financial data on the Property from before and after the foreclosure to show that the Property continued to produce a profit under its new owner, CSSNC.  (Watson Aff. ¶¶ 14–24, Ex. A–C, Jan. 4, 2013.)  While not conclusive, this evidence presents a genuine issue to be decided at trial, and pushes Plaintiffs' proof of damages beyond "hypothetical or speculative forecasts of losses." Therefore, the Court concludes that Plaintiffs have forecasted sufficient evidence to withstand summary judgment on this claim.

{88}     Accordingly, the Court hereby **DENIES** Motion II as to Plaintiffs' individual and derivative claim for unfair and deceptive trade practices.

I.

UNJUST ENRICHMENT

{89}     "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party.  The benefit must not have been conferred officiously . . . .  The benefit must not be gratuitous and it must be measurable." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).  "Additionally, the defendant must have consciously accepted the benefit." *Progressive Am. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 184 N.C. App. 688, 696, 647 S.E.2d 111, 116 (2007) (quotation omitted).  Thus, Plaintiffs must allege and prove that they conferred a benefit on Defendants, not simply that Defendants received a benefit which Plaintiffs believe Plaintiffs should have received.  *Sellers v. Morton*, 191 N.C. App. 75, 84, 661 S.E.2d 915, 923 (2008).

{90}     Here, Plaintiffs argue that Defendants' unlawful conduct benefited Defendants at the expense of Cornelius and Plaintiffs.  In particular, Plaintiffs allege that Defendants were unjustly enriched to the extent that Defendants extinguished their liability on the Guaranties.  However, the Note holder, BOGNC, conferred this benefit, not Plaintiffs.[5]  In addition, there is no evidence in the record that Plaintiffs or Cornelius conferred a benefit on BOGNC that indirectly prompted the release of Walton and White's Guaranties.  As to the claim generally, Plaintiffs

---

[5] The Court also notes that this argument is completely irrelevant as to Rorie since he never signed a Guaranty.

do not forecast any evidence that Plaintiffs or Cornelius directly or indirectly conferred any measurable benefit on Defendants, nor did Plaintiffs put forth any arguments in support of this claim in response to Motion II.  As such, the Court concludes that no genuine issues exist as to this claim.

{91}    Therefore, the Court hereby **GRANTS** Motion II as to Plaintiffs' individual and derivative claims for unjust enrichment.  Plaintiffs' individual and derivative claims for unjust enrichment are **DISMISSED** with prejudice.

J.

CONSTRUCTIVE TRUST

{92}    A constructive trust

> is a duty, or relationship, imposed by a court of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530, 723 S.E.2d 744, 751 (2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171 S.E.2d 873, 882 (1970)).

{93}    Here, Plaintiffs request a constructive trust over any funds Walton and Rorie received as a result on their misconduct.  Although the Court dismissed Plaintiffs' claim for unjust enrichment above, Plaintiffs did put forth some evidence to support their individual claim for fraud and their derivative claim for breach of fiduciary duty.  As such, the Court will not foreclose this avenue of recovery at this stage.[6]

{94}    Therefore, the Court **DENIES** Motion II as to Plaintiffs' individual and derivative claims for constructive trust.

---

[6] The Court notes that Defendants argue that the imposition of the receivership rendered this claim moot, as the Receiver now controls all aspects of Cornelius' operations.  However, as noted above, the Receiver released Cornelius' claims to the members and remains in place to wind up Cornelius. Therefore, the Court sees no reason to bar Plaintiffs' claim for relief to place any funds Defendants obtained as a result of their alleged misconduct in a constructive trust for the benefit of Cornelius.

K.

CONTRIBUTION AND INDEMNIFICATION

{95}     In the Third-Party Complaint, Plaintiffs assert an individual claim for contribution and indemnification against Walton, White, and Rorie for any recovery BOGNC receives against Plaintiffs for the deficiency under the Note and Guaranties.

1.

INDEMNIFICATION

{96}     "In North Carolina, a party's rights to indemnity can rest on three bases: (1) an express contract; (2) a contract implied-in-fact; or (3) equitable concepts arising from the tort theory of indemnity, often referred to as a contract implied-in-law." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 38, 587 S.E.2d 470, 474 (2003) (citation omitted).  An indemnity provision in a contract would clearly give rise to an indemnification claim under the first basis.  "A right of indemnity implied-in-fact stems from the existence of a binding contract between two parties that necessarily implies the right." *Id.*  Whereas, "indemnity implied-in-law arises from an underlying tort, where a passive tort-feasor pays the judgment owed by an active tort-feasor to the injured third party." *Id.* at 39, 587 S.E.2d at 474.  Thus, "[f]or indemnification implied-in-law, . . . North Carolina law requires there be an underlying injury sounding in tort[, and that the] party seeking indemnity [] have imputed or derivative liability for the tortious conduct from which indemnity is sought." *Id.* at 41, 587 S.E.2d at 475.

{97}     In their brief opposing Motion II, Plaintiffs fail to provide any specific argument in support of their indemnification claim.  Further, the Court cannot find any support for the claim in the record.  It appears that the only relevant contract before the Court with an indemnification provision is the Operating Agreement. However, it only requires Cornelius, not its members, to indemnify the manager for certain acts.  (Defs.' Br. Supp. Mot. II Ex. A § 5.5.)  In addition, the Court cannot find any facts to support implied-in-fact indemnification.  Indeed, the Operating Agreement appears to be the only contract Plaintiffs and Defendants jointly signed,

and it expressly limits the parties' liability for the debts of Cornelius. (Defs.' Br. Supp. Mot. II Ex. A § 6.1.) Thus, the Court finds no reason to imply indemnification rights among the members of Cornelius for its debts. Lastly, the claims that Plaintiffs demand indemnity for – BOGNC's claims seeking to enforce the Note and Guaranties – sound solely in contract. Therefore, no underlying tort exists for indemnification implied-in-law. As such, the Court concludes that Plaintiffs have no basis in law for their indemnification claim.

{98} Accordingly, the Court hereby **GRANTS** Motion II as to Plaintiffs' claim for indemnification against Walton, Rorie, and White. Plaintiffs' claim for indemnification is **DISMISSED** with prejudice.

2.

CONTRIBUTION

{99} "[C]ontribution is a statutory right of relief in North Carolina, governed by the *Uniform Contribution Among Tort-Feasors Act*, N.C. Gen. Stat. § 1B-1 (2001). The right is applicable only between joint tort-feasors." *Kaleel Builders, Inc.*, 161 N.C. App. at 45, 587 S.E.2d at 478 (citing *Roseboro Ford, Inc. v. Bass*, 77 N.C. App. 363, 335 S.E.2d 214 (1985)).

{100} None of the parties have alleged any underlying tort against Plaintiffs and Defendants as joint tort-feasors. As such, Plaintiffs' claim for contribution appears inapplicable. However, Plaintiffs argue that they are entitled to contribution from Walton and White, as co-guarantors on the Note, pursuant to N.C. Gen. Stat. § 25-3-116.[7] (Pls.' Br. Opp. Mot. II 31.)

{101} Section 25-3-116 grants contribution rights among those jointly and severally liable on a negotiable instrument. N.C. GEN. STAT. § 25-3-116 (2013). However,

> [t]o be a negotiable instrument, a writing must be signed by the maker or drawer, must contain an unconditional promise to pay a sum certain in money and no other promise except as authorized by statute, must be payable on demand or at a definite time, and must be payable to order or bearer.

---

[7] It appears that Plaintiffs do not rely on this argument in support of their contribution claim against Rorie since he was not a co-guarantor on the Note.

*Branch Banking and Trust Co. v. Creasy*, 301 N.C. 44, 51, 269 S.E.2d 117, 121 (1980) (citations omitted); *see also* N.C. GEN. STAT. § 25-3-104 (2013). In *Creasy*, the North Carolina Supreme Court held that a writing that obligated the defendant for "all indebtedness, obligations and liabilities . . . not [to] exceed the sum of $35,000" did not meet the requirement of a sum certain because the holder could not "determine the amount which is then payable . . . without any reference to an outside source." *Id.*

{102}　Here, the Guaranties specifically avoid setting a sum certain in money, and expressly cover all present and future debts of Cornelius. (Second Action Compl. Ex. A, B.) Given this, the Guaranties cannot be deemed negotiable instruments. Thus, as a matter of law, Plaintiffs claim for contribution cannot be based on the provisions governing negotiable instruments. Because Plaintiffs do not provide any other basis to support their claim for contribution against the Defendants, the Court concludes that no issues of fact exist to withstand summary judgment.

{103}　Therefore, the Court hereby **GRANTS** Motion II as to Plaintiffs' claim for contribution against Walton, White, and Rorie. Plaintiffs' claim for contribution is **DISMISSED** with prejudice.

L.

PUNITIVE DAMAGES

{104}　To prevail on a claim for punitive damages, Plaintiffs must succeed on a claim for compensatory damages, and prove by clear and convincing evidence that one or more of the following aggravating factors were present: (a) fraud, (b) malice, or (c) willful or wanton conduct. N.C. GEN. STAT. § 1D-15 (2013); *see also Sellers*, 191 N.C. App. at 85, 661 S.E.2d at 923.

{105}　Here, Plaintiffs bring a direct and derivative claim for punitive damages based on all claims against Walton, Rorie and White, alleging that their conduct was willful, wanton, intentional and done with a complete and reckless disregard for Plaintiffs' rights. (First Action Compl. ¶ 99; Third-Party Compl. ¶ 115.) "Summary judgment is rarely proper when a state of mind such as intent or

knowledge is at issue." *Valdese Gen. Hosp., Inc. v. Burns*, 79 N.C. App. 163, 165, 339 S.E.2d 23, 25 (1986). Because derivative and direct claims remain against Walton and Rorie and some evidence exists as to their intent, Plaintiffs' claim for punitive damages similarly survives at this stage. However, the Court dismissed all underlying claims for compensatory damages against White above. As such, Plaintiffs' punitive damages claim against White must be dismissed.

{106} Therefore, the Court **GRANTS** Motion II as to Plaintiffs' punitive damages claim against White, and **DENIES** Motion II as to Plaintiffs' individual and derivative claims against Walton and Rorie. Plaintiffs' punitive damages claim against White is **DISMISSED** with prejudice.

V.

CONCLUSION

{107} As to Motion I, the Court **GRANTS** summary judgment in favor of Defendants with respect to Plaintiffs' individual claim for breach of fiduciary duty, including the duties of good faith, fair dealing, loyalty, and due care. As to Motion II, the Court **GRANTS** summary judgment in favor of Defendants with respect to Plaintiffs' individual claim for breach of fiduciary duty; individual claims for breach of the duties of good faith, fair dealing, loyalty, and due care; individual claim for constructive fraud; individual and derivative claim for negligent misrepresentation; individual and derivative claim for unjust enrichment; individual and derivative claim for civil conspiracy and punitive damages against White; and indemnification and contribution. The Court **DENIES** all other requested relief in Motions I and II.

{108} **WHEREFORE**, the Court hereby **DISMISSES** with prejudice all claims against White in both the First and Second Actions. In the First Action, the Court **DISMISSES** with prejudice Plaintiffs' individual claims for constructive fraud, breach of fiduciary duty, breach of the duties of good faith and fair dealing, and breach of the duty of loyalty; and **DISMISSES** with prejudice Plaintiffs' individual and derivative claims for unjust enrichment and negligent misrepresentation. In the Second Action, the Court **DISMISSES** with prejudice Plaintiffs' third-party claims for contribution/indemnification, negligent misrepresentation, breach of

fiduciary duty, constructive fraud, and breach of the covenants of good faith, loyalty, and due care.

       **SO ORDERED**, this the 1st day of May 2013.